**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN LAZIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 3155 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Ryan Lazier brought this action under 42 U.S.C. § 405(g) for review of the final

decision of the Commissioner of Social Security ("the Commissioner") denying his applications

for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C.

§ 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C.

§ 1381a. Lazier has filed for summary judgment.[2] (Dkt. 9.) For the following reasons, the court

denies Lazier's motion for summary judgment and affirms the Commissioner's denial of

disability insurance benefits and SSI.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin automatically substituted for the former Commissioner, Michael J. Astrue, when she became the Acting Commissioner of Social Security on February 14, 2013. Fed. R. Civ. P. 25(d).

[2]     This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Lazier filed two motions to cite additional authority, which the court duly considered. (Dkts. 15, 20.)

# BACKGROUND

## I.      Work And Medical History

Lazier was born on September 20, 1962, and is 51 years old.[3]  (Administrative Record ("R.") 39.)  He is single, does not have children, and lives in Western Springs, Illinois, with his father.  (R. 39-40.)  He attended college but did not obtain a degree.  (R. 39.)  Prior to 1991, he worked as a pipe maker and a warranty handler.  (R. 43-47, 157, 170-72.)  Lazier was most recently employed as a senior packer at Magnetrol International, where he worked from 1991 until 2004.  (R. 40, 48, 157, 170, 267, 308.)   In July 2004, Lazier stopped working as a packer due to a knee injury for which he received worker's compensation.  (*Id*.)  After the injury, Magnetrol gave him a light duty assignment, but he was terminated in September 2004 for absenteeism.[4]  (R. 267, 308.)  Lazier reported that he was absent because he had started drinking after a period of sobriety.[5]  (R. 267, 308.)

In October 2004, Lazier's mother and brother brought him to the Hinsdale Hospital emergency room for outpatient detoxification because he was addicted to cocaine.  (R. 251.)  His family reported that he had been having paranoid delusions and suicidal ideation.  (*Id.*)  When confronted by the emergency room physician, Lazier became combative and attempted escape.  (R. 252.)  The emergency room physician diagnosed Lazier with paranoid delusions and suicidal

---

[3]      Though the action before this court is in the name of Ryan Lazier, Lazier's first name is spelled Rian in the record.

[4]      Based on Lazier's work history, the parties agree he was last insured for disability benefits on December 31, 2009.

[5]      These reports were made to medical care providers.  At his hearing before the ALJ, however, Lazier claimed that he lost his job due to a reduction in workforce rather than because of his drug addiction.  (R. 48.)

ideation and, in consultation with Dr. Ready and Dr. Chandarana, referred him for a psychiatric evaluation. (R. 249-50, 252-53.)

Dr. Chandarana was the first physician to evaluate Lazier's psychological state in October 2004, and she would remain his treating physician for the next several years. Dr. Chandarana diagnosed Lazier with bipolar disorder and cocaine abuse, and observed paranoia. (R. 256.) Dr. Ready also examined Lazier around the same time and noted that he was moderately depressed and somewhat delusional. (R. 258.) Dr. Ready believed that Lazier's condition could be treated in Hinsdale Hospital's New Day Center program, an outpatient and aftercare treatment program for chemical dependency. (*Id.*) Around this time Lazier was prescribed Lexapro, Seroquel, and Carbatrol. (R. 268.)

Lazier entered the New Day Center program in November 2004. (R. 267.) He left after a few days because he had an argument with his then-fiancée over the telephone. (*Id.*) The argument resulted in a physical confrontation between the two, and Lazier was arrested and charged with domestic violence. (*Id.*) Lazier spent three weeks in jail followed by a period of house arrest. (*Id.*)

In December 2004, Lazier returned to Hinsdale Hospital and was again examined by Dr. Ready. (R. 267-69.) Dr. Ready diagnosed Lazier with cocaine dependence, alcohol dependence, and bipolar disorder.[6] (*Id*.) He found no evidence of major depression or suicidal ideation, noting that Lazier's affect was appropriate with normal cognitive function, although Lazier appeared easily distracted and somewhat fidgety. (R. 268.) Dr. Ready again admitted Lazier to the New Day Center program, commenting that he appeared motivated for treatment. (R. 268-69.) Dr. Ready also continued Lazier's psychotropic medication, though he noted that Lazier

---

[6]     The record shows that Lazier had a history of alcoholism and cocaine addiction prior to 2004. (R. 267.)

had not taken his medication for the previous three or four days. (*Id.*) Records indicate he made some progress in the New Day Center program but, in March 2005, he suffered a relapse and was discharged from the program after a urine test screened positive for cocaine. (R. 281-83, 284-90, 374.) It appears Lazier thereafter pursued a course of treatment with Dr. Chandarana. (Dkt. 11 at 9.)

After his March 2005 relapse, the record generally indicates that Lazier continued use of his medications and stayed sober and clean. (R. 333-36, 349, 371-72, 376-95, 397-405.) He attended Alcoholics Anonymous and Narcotics Anonymous meetings, on a daily basis when possible. (R. 58-59.) In July 2009, Lazier's Alcoholics Anonymous sponsor wrote that Lazier had been sober for over a year since a brief relapse in July 2008. (R. 429.)

During this time, Lazier was unemployed but continued to seek employment. (R. 48.) He initially sought shipping and receiving work similar to his prior employment but was unable to find any. (R. 49.) Although Lazier's testimony is not clear on this issue, it appears he stopped looking for work around the time his bipolar symptoms started because he felt unable to work. (R. 49-50.) Dr. Chandarana's notes indicate that he continued looking for a job until at least 2009. (*See, e.g.,* R. 371.)

## II.     Lazier's Disability Claim

Lazier applied for SSI and disability insurance benefits in July 2007. (R. 128-32.) He sought benefits commencing on October 15, 2004, the date of discharge from his first hospitalization. (R. 16.) His claim was denied, and he requested reconsideration in January 2008. (R. 95.) His request for reconsideration was denied, and he requested a hearing before the administrative law judge. (R. 96-99, 101-02.) A hearing was held on July 16, 2009. (R.36.)

## A. Evidence Of Lazier's Limitations And Activities

At his hearing before Administrative Law Judge Jose Anglada ("the ALJ"), Lazier reported that he is unable to work because of his medical condition. He testified that he suffers from mood swings that cause both episodes of depression and racing thoughts. (R. 56-57.) During the day, racing thoughts prevent Lazier from concentrating. (R. 56-57, 63–65.) These episodes go away by themselves after several hours. (R. 64.) Because of his depression, he often takes a three-hour nap in the middle of the day. (R. 62-63.) At night, Lazier reports that racing thoughts prevent him from sleeping. (R. 57, 65.) He takes Ambien to help him sleep. (*Id.*) Lazier believes he is capable of working part-time (twenty hours per week at most). (R. 63.) He looked for part-time jobs, including construction jobs, but was unable to find any. (R. 63, 384.)

Lazier testified that he is active around the house. He cared for his mother, who had neuropathy, until she passed away in 2006. (R. 65-66, 309.) He cleans the house and rakes the yard, though a landscaper takes care of the bulk of the yard work. (R. 66.) He goes shopping with his father and cooks for his family. (R. 66, 309.) He also does the laundry. (R. 67.)

Outside the house, Lazier has a number of friends through Alcoholics Anonymous and Narcotics Anonymous whom he usually sees daily. (R. 58-59, 429.) He and his father often eat out at restaurants. (R. 65.) In a 2007 questionnaire, Lazier reported that he enjoys working on cars, and he usually drives once a day, either to visit family or run errands. (R. 182, 309.) Lazier also performs community service but the record is silent as to the nature of the service he performs. Dr. Chandarana's treatment notes, dated May 2007, indicate that Lazier performed 40-45 hours of service per week, though they specified neither the organization for which Lazier worked nor the type of work he performed. (R. 301.)

B.	**Evidence From Experts**

In making his decision, the ALJ relied on the medical conclusions of six doctors and one vocational expert. Dr. Chandarana, M.D., Dr. Brauer, Psy. D., Dr. Heinrich, Ph. D., and Dr. Hudspeth, Psy. D. submitted written medical opinions. Dr. Rozenfeld, Psy. D. and Dr. Biscardi, Ph. D. completed medical interrogatories. Pamela Tucker, a vocational expert, testified at the hearing before the ALJ.

1.	**Dr. Chandarana**

Dr. Chandarana initially diagnosed Lazier with bipolar disorder and cocaine abuse in October 2004 when his family brought him to Hinsdale Hospital. (R. 256.) She continued as Lazier's treating physician and saw him on a roughly monthly basis for the following two-and-a-half years between the 2004 hospitalization and his application for SSI and disability insurance benefits in July 2007. In June 2007, Dr. Chandarana completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), diagnosing Lazier with schizoaffective disorder. (R. 292-93.) The form listed twenty-two work-related activities; Dr. Chandarana rated Lazier's performance ability as "poor" for fourteen activities and "fair" for eight. (*Id*.) She further noted that he had been hospitalized twice and got confused at times. (*Id.*)

2.	**Dr. Brauer**

Dr. Brauer examined Lazier in October 2007 for approximately fifty minutes and diagnosed him with bipolar disorder. (R. 307-10.) Lazier appeared appropriately groomed and attired and was cooperative, responding to inquiries to the best of his ability. (R. 309.) Lazier was "alert, calm, and oriented" but his affect was somewhat depressed. (*Id.*) His speech was "clear, logical, and sequential, with no unusual content." (*Id.*) Dr. Brauer observed and tested Lazier's mental capabilities and determined that his concentration and attention were somewhat

impaired.  (*Id.*)  Lazier's general knowledge, his capacity for classification and categorization, and his judgment were intact; and his capacity for abstraction was within normal limits.  (R. 309-10.)  Dr. Brauer concluded that Lazier was stable, but that his history of symptoms was consistent with a diagnosis of bipolar disorder.  (R. 310.)

### 3. Dr. Heinrich

Dr. Heinrich reviewed the record and issued a medical opinion in October 2007, one week after Dr. Brauer's examination.  (R. 311-28.)  He did not separately examine Lazier.  Dr. Heinrich completed a Residual Functional Capacity Assessment, finding Lazier "not significantly limited" for twelve of twenty categories, "moderately limited" for two, and without evidence of limitation for the remaining six.  (R. 325-26.)  The categories of moderate limitation were "ability to maintain attention and concentration for extended periods" and "ability to respond appropriately to changes in the work setting."  (*Id.*)  Based on the record, Dr. Heinrich diagnosed bipolar disorder and a history of substance abuse.  (R. 314, 319.)  His opinion discussed the hospital records, Dr. Brauer's examination, and additional facts of record, but it did not discuss Dr. Chandarana's treatment notes.  (R. 311-28.)  His narrative assessment found Lazier limited by some mood instability and inability to concentrate, but he concluded that Lazier retained the mental and behavioral capacity to do simple tasks within such limitations.  (R. 327.)

### 4. Dr. Hudspeth

Dr. Hudspeth reviewed the record and issued a medical opinion in February 2008.  (R. 337-50.)  He did not separately examine Lazier.  (R. 349.)  His narrative notes briefly discussed the hospital records, Dr. Chandarana's notes and diagnosis, and Dr. Brauer's examination.  (R.

349.)  Dr. Hudspeth found Lazier's impairments "not severe," diagnosing bipolar disorder with a long history of alcohol and cocaine abuse.  (R. 337, 340.)

### 5. Dr. Rozenfeld

Dr. Rozenfeld completed a medical interrogatory in February 2009.  (R. 352-57.)  She reviewed the record but did not examine Lazier.  (R. 356.)  In her review, she discussed Lazier's hospital stays, Dr. Chandarana's treatment, notes and diagnosis, and Dr. Brauer's examination. (*Id.*)  Dr. Rozenfeld found sufficient evidentiary support for bipolar disorder and a history of cocaine and alcohol dependence, and determined that these impairments did not meet or equal an impairment listed in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 ("Listing of Impairments").  (R. 354, 356.)  She concluded that, based on the evidence of record, Lazier's bipolar disorder was stable on medication and was non-severe.  (R. 356.)  She did not find any limitations in his daily activities but found mild limitations in his social functioning and ability to maintain concentration, persistence, and pace.  (*Id.*)  Dr. Rozenfeld specifically addressed Dr. Chandarana's opinion, giving it little weight because her underlying progress notes did not support her suggested limitations.  (*Id.*)  Dr. Rozenfeld found the underlying progress notes more consistent with Dr. Brauer's narrative, which suggested that Lazier was stable.  (*Id.*)

### 6. Dr. Biscardi

Dr. Biscardi, the last of the medical experts, completed a medical interrogatory in May 2009.  (R. 359-67.)  He reviewed the hospital records, Dr. Chandarana's notes and diagnosis, and Dr. Brauer's examination, but he did not examine Lazier.  (R. 359.)  Dr. Biscardi found documentation of bipolar or schizoaffective disorder, a history of cocaine and alcohol dependence, and paranoid personality traits.  (*Id.*)  He found that his findings were consistent with Lazier's allegations and Dr. Brauer's mental examination report.  (*Id.*)  Dr. Biscardi

concluded that, in the absence of drug abuse and alcoholism, Lazier had the capacity to "understand, remember, carry out, and sustain performance of simple routine tasks, complete a normal workday, interact with co-workers/supervisors and adapt to changes/stressors associated with simple routine competitive work activities." (*Id.*)

### 7.    Vocational Expert Tucker

Tucker, a vocational expert, testified at the hearing before the ALJ. (R. 68-79.) Tucker discussed Lazier's job history, the effects of his limitations on his ability to work, and the jobs that would be available to someone with a given set of limitations. (*Id.*) She also answered a number of hypothetical questions, two of which are directly at issue.

First, the ALJ asked Tucker a hypothetical question about someone with the limitations described by Dr. Heinrich, which include moderate limitations in the ability to maintain attention for extended periods and the ability to respond appropriately to changes in the work setting. (R. 73-75; *see also* R. 325-26.) Tucker answered that if Lazier had such limitations, he would not be able to perform his prior job, as it required skilled and semi-skilled tasks that are incompatible with such limitations. (R. 74.) Tucker testified that Lazier could, however, perform the unskilled work of a laundry worker, store laborer, or dish washer, of which there are approximately 13,500 positions in the Chicago metropolitan area. (R. 74-75.)

Second, Lazier's attorney asked Tucker a set of hypothetical questions about someone with the mental abilities described by Dr. Chandarana. (R. 77-79; *see also* R. 292-93.) Tucker testified that an inability to carry out complex instructions or make judgments on complex work-related decisions would preclude any type of skilled or semi-skilled work. (R. 77.) She further stated that an inability to carry out short, simple instructions on a consistent basis would preclude any work at all. (*Id.*) A significant inability to maintain attention and concentration for extended

periods also would preclude any work. (R. 77-78.) Consistent failure to perform activities within a schedule, maintain attendance, and be punctual also would preclude any work, as would an inability to sustain an ordinary routine without special supervision. (R. 78.) Failure to complete a normal work day would preclude employment, as would failure to consistently perform at a consistent pace. (*Id.*)

### C.     ALJ Decision

The ALJ denied Lazier's claim in September 2009. (*See* R. 13-29.) The ALJ found that Lazier was not employed and that his bipolar disorder and history of drug and alcohol addiction were severe impairments, but that Lazier's substance abuse was an exacerbating factor. (R. 18-20) The ALJ further found that if Lazier ceased abusing drugs and alcohol, his remaining limitations, while severe, do not equal an impairment from the Listing of Impairments.[7] (R. 20-23.) The ALJ concluded that, if Lazier does not use drugs or alcohol, he has sufficient residual functional capacity to perform work at all exertional levels with moderate limitation in his ability to respond to changes in the work environment and maintain attention and concentration. (R. 23-29.) Although these limitations would not allow Lazier to perform his past relevant work, the ALJ found that there are a significant number of jobs in the national economy that Lazier could perform given his age, education, work experience, and residual functional capacity.[8] (R. 27-29.) In making his determination, the ALJ did not credit Lazier's statements about the limiting effects of his symptoms, citing treatment notes that showed Lazier's treatment was effective in

---

[7]     The ALJ analyzed Lazier's impairments under 12.04 (Affective Disorders) and found that he did not meet the requirements of paragraph B or C of that section. (R. 21-23.)

[8]     Lazier was 42 years old on his alleged disability onset date and 47 years old on the date of the ALJ's decision. At both times, he was considered a "younger individual" under the Social Security regulations. *See* 20 C.F.R. § 1563(c).

minimizing the symptoms and that indicated that Lazier was looking for a job but could not find one. (R. 25.)

Lazier requested review of the ALJ's decision. (R. 11.) The Appeals Council denied the review in April 2011 (R. 1-3), and the ALJ's decision therefore became the final decision of the Commissioner pursuant to 20 C.F.R. § 404.981. Lazier filed this action in May 2011, (dkt. 1), and moved for summary judgment, (dkt. 9).

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013) (citing 42 U.S.C. §405(g); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)).[9] "Substantial evidence" has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [it] must uphold the decision under review." *Shideler* v. *Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's decision, however, must rest on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler*, 688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision

---

[9] The Act provides, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## DISCUSSION

To determine whether a claimant is disabled and thus eligible for disability insurance benefits or SSI, an ALJ uses a sequential five step inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If so, the claimant is not eligible for benefits. *See id.* At step two, the ALJ assesses whether the claimant has an impairment of combination of impairments that are severe. *See id.* At step three, the ALJ determines whether the impairment(s) meet or equal a listed impairment in the Social Security regulations and thus preclude substantial gainful activity. *See id.*; 20 C.F.R. pt. 404, subpt. P, app. 1. At step four, the ALJ analyzes the claimant's residual functional capacity ("RFC") to determine whether the claimant can perform his past relevant work. *See* 20 C.F.R. §§ 404.1520, 416.920. Finally, at step five, the ALJ determines whether the claimant can perform other work considering the claimant's RFC, age, education and experience. *See id.* "The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step." *Young* v. *Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). In addition to the five-part test, the Act provides that a claimant is not entitled to disability insurance benefits if drug abuse or alcoholism is a material and contributing factor to a determination of disability. 42 U.S.C. § 423(d)(2)(c).

Lazier advances two arguments for reversal of the ALJ's denial of benefits: (1) the ALJ's decision improperly rejected the limitations set forth by Lazier's treating physician, Dr. Chandarana, and gave excessive weight to the other medical sources in the record; and (2) the ALJ improperly assessed Lazier's credibility with regard to his capability to work.

## I.     ALJ's Weighing Of Medical Evidence

### A.     Dr. Chandarana's Assessment

Dr. Chandarana opined that Lazier's capabilities are limited to an extent that precludes any employment. In contrast, the assessment of Dr. Brauer and the opinions of Drs. Heinrich, Rozenfeld, and Biscardi generally concluded that Lazier's moderate limitations do not preclude employment.[10]

The opinion of a treating physician will be controlling where it is well supported by medical findings and it is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); *Bauer* v. *Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citing *Hofslien* v. *Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)). In such cases, the ALJ cannot refuse to accept a treating physician's opinion. *Bauer*, 532 F.3d at 608 (citation omitted). If there is evidence that contradicts the opinion of a treating physician, however, that opinion must be weighed against the contradictory evidence. *Id.* In weighing a treating physician's opinion, an ALJ must consider the "length, nature, and extent of the treatment relationship," as well as the consistency and supportability of the opinion, among other factors. *Moss* v. *Astrue,* 555 F.3d 556, 561 (7th Cir. 2009); *see also* 20 C.F.R. § 404.1527(c). In general, the more evidence a medical source presents in support of an opinion, the more weight it will be given. 20 C.F.R. § 404.1527(c)(3);

---

[10]     Neither party contests the employment ramifications of the contradictory opinions. If Dr. Chandarana's opinion of Lazier's limitations is accurate, Lazier would not be able to work; if the assessments of the other medical experts are accurate, Lazier would be able to work.

*see also Givens* v. *Colvin*, -- F. App'x ----, No. 13-2000, 2013 WL 6623179, at *6 (7th Cir. Dec. 17, 2013). Opinions will also be given more weight where they are more consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(4).

Lazier asserts the ALJ erred in failing to consider the length and extent of his treatment relationship with Dr. Chandarana, which he argues should render her opinion controlling. The ALJ's decision, however, discussed the nature of the treatment relationship. The ALJ noted that Lazier was referred to Dr. Chandarana after his first hospital stay. (R. 24.) He then discussed Dr. Chandarana's treatment notes over a two-year period before discussing her ultimate opinion as to Lazier's limitations. (R. 24-25.) The ALJ was aware of the length of Dr. Chandarana's treatment and, given that he discussed her treatment notes on a month-by-month level of granularity, he also was aware that she saw him often during that time. Nonetheless, after a review of Dr. Chandarana's notes, the ALJ concluded that her restrictive assessment of Lazier's capabilities was "inconsistent with the objective findings and observations contained in [his] treatment records." (R. 25.)

Although Lazier correctly states that the ALJ cannot "play doctor," *see Banks* v. *Gonzales*, 453 F.3d 449, 454 (7th Cir. 2006), the ALJ did not do so in his opinion. Instead, he relied on evidence from other doctors. Immediately after discussing Dr. Chandarana's opinion, the ALJ discussed the contrary evidence from the other medical sources, including Dr. Brauer's examination, the assessment of Dr. Heinrich, the interrogatories completed by Drs. Rozenfeld and Biscardi, and the lay evidence provided by Lazier's Alcoholics Anonymous sponsor. (R. 25-27.) The ALJ gave weight to Dr. Brauer's opinion, which was based on an independent examination of Lazier and a review of treatment notes, finding that it was more consistent with

the record as a whole than Dr. Chandarana's assessment.[11]  (R. 26.)  The ALJ then detailed the

findings of three other medical sources that corroborate Dr. Brauer's assessment.  (R. 26-27.)

The ALJ relied heavily on the medical interrogatory of Dr. Rozenfeld, who drew conclusions

based in part on the fact that Lazier's bipolar disorder was stable, a fact that was documented by

Dr. Chandarana herself.  (*Id.*; *see also* R. 356.)  The ALJ also noted that Dr. Rozenfeld critiqued

the extensive limitations suggested by Dr. Chandarana, stating that her treatment notes did not

support her conclusions and in fact were in line with Dr. Brauer's examination.[12]  (R. 27; *see*

*also* R. 356.)

    The ALJ marshalled adequate evidentiary support for his finding that Dr. Chandarana's

opinion was inconsistent with substantial evidence in the record and sufficiently expressed his

reasons for rejecting her opinion.[13]  His rejection of Dr. Chandarana's opinion was not based on

his own beliefs about Lazier, but on the conclusions drawn and errors noted by other medical

sources working off largely the same set of notes.  *See Schreiber* v. *Colvin*, 519 F. App'x 951,

---

[11]    Lazier argues that Dr. Brauer's findings should be given less weight because he failed to
complete a form called a "medical source statement," which is described in Social Security's Program
Operations Manual System ("POMS") at DI 22510.015B(2)(a).  Lazier provides no authority that such
opinions must be in a certain form.  In fact, the provision states, "The detail and format for reporting the
results of a CE will vary, depending on the type of examination or testing requested."  POMS DI
22510.015B.  Lazier does note that unlike Dr. Brauer, Dr. Chandarana filled out a two-page check-box
form titled "medical source statement."  (R. 292-93.)  When that form is compared to Dr. Brauer's four-
page narrative report, it is clear that the form is less comprehensive and provides less insight into Lazier's
condition.

[12]    The ALJ additionally noted a number of discrepancies in the severity of limitations Dr.
Chandarana ascribed to Lazier.  He noted that she cited schizoaffective disorder and its resultant
confusion for what she termed a "poor" ability to carry out instructions, maintain attendance, and respond
to criticism and changes in the work setting, yet she believed he had a "fair" ability to remember short and
simple instructions, remember locations and work-like procedures, get along with coworkers and peers,
interact with the public, and maintain socially acceptable behavior.  (R. 25; *see also* R. 292-93.)

[13]    Lazier cites *Bates* v. *Colvin*, 736 F.3d 1093 (7th Cir. 2013), for the proposition that an ALJ must
provide good reasons in order to discount a treating physician's opinion.  *Id.* at 1101.  *Bates* is
distinguishable from the instant case because the *Bates* ALJ did not have any other medical evidence to
rely on in discounting the treating physician's opinion.  *Id.*

958 (7th Cir. 2013) (affirming ALJ's discounting of treating physician's opinion where it was inconsistent with both treatment notes and reviewing physicians' opinions); *cf. Bauer*, 532 F.3d at 608 (reversing ALJ's denial where ALJ relied on reviewing physician who simply expressed contrary view, rather than identifying flaw in treating physicians' analysis). The ALJ did not err by giving Dr. Chandarana's opinion less than controlling weight.

**B.     ALJ's Use Of "Examiner" To Describe Non-Examining Medical Sources**

Lazier argues that the ALJ's use of the word "examiner" to describe two doctors who never met with Lazier shows that the ALJ misunderstood the doctors' roles and thus gave inappropriate weight to their opinions. An ALJ's mischaracterization of medical evidence may require remand. *See, e.g., Golembiewski* v. *Barnhart*, 322 F.3d 912, 916-17 (7th Cir. 2003) (mischaracterization of medical evidence undercuts ALJ's assessment of that evidence); *Johnson* v. *Astrue*, No. 11 C 3989, 2012 WL 3205039, at **8-9 (N.D. Ill. Aug. 2, 2012) (remanding where ALJ mischaracterized medical evidence and failed to mention significant evidence in favor of claimant).

Lazier is correct that the ALJ refers to the opinions of Drs. Heinrich and Hudspeth as those of examiners, but there is no indication that the ALJ believed that either doctor actually met with Lazier. The ALJ clearly identified the non-treating medical source who *did* physically examine Lazier, repeatedly referring to Dr. Brauer's "consultative examination," a term that is never used to describe the assessments of Drs. Heinrich and Hudspeth.[14] (R. 20-22, 26-27.) The ALJ also twice explained that he gave Dr. Brauer's opinion significant weight because he had the

---

[14]     The term "consultative examination" is a well-established term for "a physical or mental health examination or test purchased on behalf of a claimant at SSA's expense." David Wittenburg et al., *An Assessment of Consultative Examination (CE) Processes, Content, and Quality: Findings from the CE Review Data*, at xi (Nov. 4, 2012), http://www.ssa.gov/disabilityresearch/documents/CE%20Report%202.pdf.

opportunity to personally examine Lazier. (R. 21, 26.) In contrast, the ALJ's references to the opinions of Drs. Heinrich and Hudspeth noted that they relied on the findings of the "consultative examiner" (Dr. Brauer) and treating source (Dr. Chandarana). The ALJ never stated or implied that either Dr. Heinrich or Dr. Hudspeth saw Lazier, and his narrative is consistent with a belief that they only reviewed the record.

A reviewing court is bound to give an ALJ's opinion "a commonsensical reading rather than nitpicking at it." *Johnson* v. *Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (citations omitted). Reviewing the ALJ's opinion in its entirety, the most plausible interpretation is that he distinguished the types of medical sources by using the terms "treating," "consultative examiner," and "examiner." There is no requirement that an ALJ use particular terms when issuing his or her decision, and the court will not overturn the ALJ's decision solely because of his linguistic choices. *See, e.g., Thurman* v. *Colvin*, No 1:12-CV-516, 2013 WL 4671551, at *2 (S.D. Ind. Aug. 29, 2013) (refusing to reverse denial of benefits because of ALJ's word choice).

Finally, even if the ALJ gave too much weight to the opinions of Drs. Heinrich and Hudspeth, such an error would only be grounds for reversal if "there is reason to believe the remand might lead to a different result." *Masters* v. *Astrue*, 818 F. Supp. 2d 1054, 1071 (N.D. Ill. 2011) (quoting *Fisher* v. *Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)); *see also Keys* v. *Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (reaffirming application of harmless error doctrine to judicial review of administrative decisions). If an ALJ does err, but it can be said "with great confidence" that the result would not change on remand, then the error is not grounds for reversal. *McKinzey* v. *Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

Here, the ALJ's analysis of Lazier's impairments, including his rejection of Dr. Chandarana's opinion, was supported by substantial evidence even without *any* reference to the

opinions of either Dr. Heinrich or Dr. Hudspeth. The ALJ made reference to the reviewing physicians' opinions for the proposition that Lazier was suffering from bipolar disorder, a diagnosis also made by Dr. Brauer, Dr. Rozenfeld, and Dr. Biscardi. He referred to these opinions for information on Lazier's "levels of activities of daily living," facts available through Dr. Chandarana's notes and Dr. Brauer's observations. (R. 21.) The ALJ discussed the reviewing physicians' conclusions as to Lazier's level of impairment in social functioning, but only after discussing the parallel conclusions of Dr. Brauer and Dr. Chandarana. (R. 21-22.) He further discussed Dr. Heinrich's opinion as consistent with the record and parallel to that of Dr. Brauer. (R. 26.) In all, Dr. Heinrich's and Dr. Hudspeth's analyses and conclusions were parallel to those of the three others medical sources of uncontested status, Drs. Brauer, Rozenfeld, and Biscardi. Crucially, the ALJ's primary reason for giving less weight to Dr. Chandarana's opinion—that her conclusions were not supported by her own treatment notes— derived from Dr. Rozenfeld's analysis, and is bolstered by the parallel responses of Dr. Biscardi. (R. 26-27.)

As there is no indication the ALJ was mistaken as to the actual roles of Drs. Heinrich and Hudspeth, the court finds there was no error in his terminology. Even if the ALJ mischaracterized their roles, his rejection of the treating physician's opinion was supported by substantial evidence in the record. There is no reason to believe the ALJ's decision would change on remand, and thus any error is harmless.

## II.     ALJ's Assessment Of Credibility

Lazier alleges error in the ALJ's rejection of his credibility, mentioning five failures on the ALJ's part. The court cannot easily overturn an ALJ's credibility finding. Because the ALJ is in the best position to assess credibility, an ALJ's determination of credibility will only be

reversed if it is "patently wrong." *McKinzey*, 641 F.3d at 890 (quoting *Skarbek* v. *Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). An ALJ's credibility determination is patently wrong if there is no explanation or support for the determination. *Elder* v. *Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

First, Lazier puzzlingly asserts that the ALJ improperly analyzed his complaints of pain even though he did not inform the ALJ he suffered from any physical pain. In support, Lazier cites to *Luna* v. *Shalala*, 22 F.3d 687 (7th Cir. 1994), as requiring an ALJ to investigate "'all avenues,' which 'include . . . dosage and effectiveness of any . . . medications . . . .'" (Dkt. 11 at 11 (quoting *Luna*, 22 F.3d at 691) (ellipses in original).) Lazier mischaracterizes *Luna*. Expanding the quotation shows that the ALJ's obligation is to "investigate all avenues presented *that relate to pain*, including . . . dosage and effectiveness *of any pain medications* . . . ." *Luna*, 22 F.3d at 691 (emphasis added); *see also Brown* v. *Barnhart*, 298 F. Supp. 2d 773, 795 (E.D. Wisc. 2004) (discussing application of *Luna* in pain context). Lazier never claims that he suffers from pain and the ALJ cannot be required to investigate a claim not presented to him.

Second, Lazier argues that the ALJ failed to discuss the dosage and effectiveness of his medications, as required by Social Security rulings. *See* SSR 96-7P, 1996 WL 374186, at *3 (July 2, 1996). The ALJ did not ignore Lazier's medications. Lazier's medications were discussed at the hearing in front of the ALJ, but Lazier did not mention any side effects. (*See, e.g.,* R. 57, 65.) The ALJ's decision recited the medications Lazier used and reasons that they were prescribed, and he took note that Lazier once complained that his medications made him tired and slow. (R. 23-26; *see also* R. 201.) Although the ALJ should have specifically asked about the side effects of Lazier's medication at the hearing, the oversight does not undermine his

ultimate credibility finding because he provided adequate reasons for disbelieving Lazier.  *See*

*Flint* v. *Colvin*, 543 F. App'x 598, 600 (7th Cir. 2013).

Third, Lazier contends that the ALJ ignored his testimony that his drug and alcohol use

was self-medication.  Material contributory substance abuse of any sort will bar a claimant from

receiving disability benefits, regardless of the reason for the abuse.  42 U.S.C. § 423(d)(2)(c); *see*

*also Gritzmacher* v. *Astrue*, 572 F. Supp. 2d 1051, 1060 (W.D. Wisc. 2008) ("[T]he regulations

make clear that the only relevant question is whether plaintiff's bipolar and affective disorders

would still be disabling if he stopped using alcohol and drugs.").

Fourth, Lazier argues the ALJ should have considered his need to sleep for several hours

each day, asserting that the vocational expert Tucker testified it would preclude competitive

employment.[15]  The ALJ did consider Lazier's claim that he often takes a three hour nap during

the day (*see* R. 24) but discounted the claim based on his review of the treatment records,

emphasizing the fact that the records indicated that Lazier had sought demanding jobs during the

alleged time of disability (R. 25).  *See Jacobsen* v. *Astrue*, No. 08 C 50173, 2010 WL 1539871,

at *13 (Apr. 16, 2010) (finding conflict between claimant's stated limitations and job search

undermined credibility).

---

[15]     The transcript is not wholly consistent with this assertion as Tucker appears to have testified to
the opposite.  (*See* R. 76 (ALJ:  "[Lazier] has to lie down and sleep several hours . . . up to three hours.
Will that be consistent with full-time employment on an ongoing basis competitively?" Tucker:  "Yes,
that would.").)  The next question, however, indicates that something may have been lost in the
transcription process:  Lazier's Counsel:  "A couple hours of off task like that would *also* preclude
employment, right?"  Tucker:  "Correct."  (R. 76-77 (emphasis added).)  Based on this inconsistency, the
court cannot clearly determine whether Tucker meant to testify that Lazier could work even if he had to
take a three hour nap every day.  It seems apparent to the court that such a limitation would significantly
reduce the number of jobs available to Lazier.  As discussed above, this point is moot because the ALJ
did not credit Lazier's claimed limitations to the extent they were inconsistent with the residual functional
capacity assessment.  (R. 24.)

Finally, Lazier argues that the ALJ improperly held his community service work against him without investigating what the service entailed.  Lazier contends that "the record does not reflect whether Lazier was just standing, sitting or lying around, or was actively engaged in work."  (Dkt. 11 at 12 (citing *Rousey* v. *Heckler*, 771 F.2d 1065 (7th Cir. 1985) (community service may be sedentary in nature)).)  In Lazier's case, however, it would not matter if the work was sedentary or active.  Lazier never complained that he is unable to exert himself; he complained that he cannot maintain concentration for adequate periods to perform meaningful work.  The fact that his treating physician's notes indicate that he performed 40-45 hours of community service per week detracts from his credibility.  (R. 295, 301.)  Furthermore, Lazier's community service was only one of a number of activities considered by the ALJ.  The ALJ also noted that (1) Lazier considered himself capable of working part time and actively sought work, including relatively demanding jobs in construction; (2) he attended three to four Alcoholics Anonymous or Narcotics Anonymous meetings per week; and (3) he performed work around the house, including washing dishes, cooking for his family, caring for his mother, and working on cars, among other things.  (R. 19, 21 23-26.)  The ALJ is not required to discuss every piece of evidence in detail; his obligation is to rely upon substantial evidence.  *Dixon* v. *Massanari*, 270 F.3d 1171, 1176-77 (7th Cir. 2001) (affirming ALJ's rejection of medical source credibility). The ALJ here relied on a number of Lazier's activities to reject Lazier's claim that his impairments precluded him from performing any type of full-time work.

**CONCLUSION**

For the foregoing reasons, Lazier's motion for summary judgment (dkt. 9) is denied and the Commissioner's denial of disability insurance benefits and SSI is affirmed. The clerk is directed to enter judgment in favor of the defendant.

Date: May 21, 2014